812 F.2d 311
 55 USLW 2470, 16 Collier Bankr.Cas.2d 218,
15 Bankr.Ct.Dec. 1105, Bankr. L. Rep. P 71,613
 In the Matter of McVEY TRUCKING, INC., Debtor-Appellant.
McVEY TRUCKING, INC., Plaintiff-Appellant,
v.
SECRETARY OF STATE OF ILLINOIS, First National Bank of
Danville and First Midwest Bank of Danville,
Defendants-Appellees.
 No. 86-1216.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1986.
Decided Feb. 13, 1987.
 
 John L. Greenleaf, Jr., Byers, Byers & Greenleaf, Ltd., Decatur, Ill., for debtor-appellant.
 Thomas P. Marnell, Illinois Atty. Gen., Chicago, Ill., for defendants-appellees.
 Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 McVey Trucking, a debtor, brought this action under Sec. 547(b) of the Bankruptcy Code to recover money that it claims was improperly transferred to the Secretary of State of Illinois. The bankruptcy court dismissed the action, holding that under the Eleventh Amendment it lacked jurisdiction over the Secretary. The district court affirmed. Because Congress, in the exercise of its plenary power to enact bankruptcy legislation, may create a cause of action for money damages enforceable against a state in federal court, and because we are certain that, in enacting Sec. 547(b) of the Bankruptcy Code, Congress intended to subject states to suit, we reverse and remand.
 
 
 2
 * On February 27, 1984, McVey Trucking placed a certificate of deposit, payable to the Secretary of State of Illinois, on deposit with the First National Bank of Danville. The certificate, in the amount of $20,188.25, reflected the balance that McVey then owed to the State of Illinois for its prospective highway use tax for 1984 and 1985.[1] McVey placed a similar certificate, for $2,490.00, with the First Midwest Bank of Danville. McVey intended for the second certificate to cover its future liability to the state for its flat-weight tax. One month later, the First National Bank, which was also McVey's creditor, forced McVey to cease operation. McVey was placed in involuntary bankruptcy, under Chapter 11 of the Code, on May 16, 1984.
 
 
 3
 Three weeks after the initiation of the bankruptcy proceedings, on July 9, 1984, the Secretary of State requested the First National Bank of Danville to pay over to the state the $20,188.25 in McVey's certificate. The Secretary claimed that McVey, even though in bankruptcy, still owed this money for the state's highway use tax. Without requesting permission from the bankruptcy court, the bank made the payment. McVey thereupon filed suit against the Secretary and the bank, pursuant to Sec. 547(b) of the Bankruptcy Code, 11 U.S.C. Sec. 547(b) (1982 & 1985 Supp.), seeking to avoid the transfer.
 
 
 4
 The Secretary of State moved to dismiss McVey's suit, arguing that because he was a state official, the Eleventh Amendment to the United States Constitution denied the bankruptcy court personal jurisdiction over him unless the state consented to be sued. The bankruptcy court, concluding that the State of Illinois had not consented to suit, granted the motion on April 29, 1985.
 
 
 5
 Immediately after the bankruptcy court entered its order, the Secretary of State requested the First Midwest Bank of Danville, in which McVey had deposited $2,490.00, to transfer the deposited funds to the state. The bank complied. McVey responded by amending its complaint, joining First Midwest as a defendant, and moving for reconsideration. The bankruptcy court denied the motion to reconsider. McVey appealed, arguing that in enacting Sec. 547(b) of the Bankruptcy Code, Congress created a cause of action enforceable against a state in federal court. The district court rejected this contention and affirmed the bankruptcy court's dismissal. McVey then brought this appeal.
 
 II
 
 6
 The Secretary of State is the named defendant in this case. Nonetheless, it is obvious that this is, in reality, a suit against the State of Illinois. See Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (A suit "seeking to impose a liability which must be paid from public funds in the state treasury" is a suit against the state.). Congress may create a cause of action for money damages enforceable against an unconsenting state in a federal court only if the Constitution grants Congress the power "to subject a State to suit in [the given] circumstances," Parden v. Terminal Railway, 377 U.S. 184, 187, 84 S.Ct. 1207, 1210, 12 L.Ed.2d 233 (1964). In deciding this case, therefore, we must determine whether the constitutional grant of power to Congress "[t]o establish ... uniform Laws on the subject of Bankruptcies," U.S. Const. Art. I Sec. 8, Cl. 4, gives Congress the power to create a cause of action for money damages against a state. We must also determine whether Article III gives the federal courts the power to issue an enforceable order against a state in such a suit.
 
 A.
 
 7
 The Supreme Court has made clear that when Congress acts pursuant to its power under Sec. 5 of the Fourteenth Amendment,[2] it may create a cause of action for money damages enforceable against an unconsenting state in the federal courts.[3] In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held that Congress, acting under the Fourteenth Amendment, could create a cause of action for money damages against a state that had engaged in employment discrimination in violation of Title VII of the Civil Rights Act. However, the Court has left open the question of whether Congress may create a cause of action for money damages enforceable against an unconsenting state in federal court when it acts under its Article I powers. See Oneida County v. Oneida Indian Nation, 470 U.S. 226, 252, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985).
 
 
 8
 This court has previously held that Congress' power to create a cause of action for money damages enforceable against an unconsenting state in federal court is not limited to legislation enacted pursuant to Sec. 5 of the Fourteenth Amendment. See Jennings v. Illinois Office of Education, 589 F.2d 935 (7th Cir.), cert. denied, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). In Jennings we held that Congress, acting under the War Powers Clauses, U.S. Const. Art. 1 Sec. 8, Cl. 11-13, could create a cause of action against a state by veterans seeking reemployment rights granted by Congress. In reaching this result, we concluded that "to the extent Congress acts within sovereign powers delegated to it by the states ... it has the power to abrogate states' immunity." Id. at 941-42. At least three circuits have adopted this approach. See County of Monroe v. Florida, 678 F.2d 1124, 1128-35 (2nd Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983) (Congress may create a cause of action against a state under its extradition powers.); Peel v. Florida, 600 F.2d 1070, 1074-82 (5th Cir.1979) (cause of action created under the War Powers Clauses permitted); Mills Music v. Arizona, 591 F.2d 1278, 1285 (9th Cir.1979) (cause of action created under the Copyright and Patent Clause permitted).
 
 
 9
 Despite the acceptance of our approach in Jennings, two recent Supreme Court cases may have called its holding into question. These decisions expressly link the power of Congress to create a cause of action for money damages enforceable against an unconsenting state in federal court with Congress' exercise of its power under the Fourteenth Amendment. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 3145, 3146, 3148, 87 L.Ed.2d 171 (1985) ("[W]hen acting pursuant to Sec. 5 of the Fourteenth Amendment, Congress can" create a cause of action against a state); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) ("Congress has the power with respect to rights protected by the Fourteenth Amendment to" create a cause of action against a state.). The Court's language may reflect the fact that, to date, it has only considered Congress' ability to create a cause of action for money damages enforceable against an unconsenting state in federal court in cases in which Congress has acted under its Fourteenth Amendment power. However, it is also possible that the Court may be indicating that the Fourteenth Amendment is the only grant of power that allows Congress to do so.
 
 
 10
 A recent case decided by this court suggests, albeit in a dictum, that we may have abandoned the approach taken in Jennings. In Gary A. v. New Trier High School District 203, 796 F.2d 940 (7th Cir.1986) (per curiam), we suggested that "[a] state may be sued on a federal court only if it consents ... or if Congress, using powers granted by section 5 of the Fourteenth Amendment, abrogates the state's immunity." Id. at 943 (citations omitted) (emphasis added). In light of the language used by the Supreme Court and by this circuit, we feel compelled to revisit our decision in Jennings.
 
 B.
 
 11
 Article I and the Fourteenth Amendment are both plenary grants of power to Congress. At first glance, therefore, it would appear that because Congress may create a cause of action for money damages enforceable against an unconsenting state in federal court under the Fourteenth Amendment, it should also be able to do so under Article I. In order to limit Congress' power to create a cause of action enforceable against an unconsenting state in federal court to actions that Congress takes in the exercise of its Fourteenth Amendment power, it is necessary to demonstrate that there is some constitutionally significant way of distinguishing Congress' Fourteenth Amendment power from its Article I powers. If there is no constitutionally significant way of distinguishing between these two grants of plenary power, then we must conclude, as we did in Jennings, that Congress' ability to create a cause of action for money damages enforceable against an unconsenting state in federal court is not limited to actions that it takes using its Fourteenth Amendment power but, rather, that Congress may do so under any plenary power.
 
 
 12
 We consider two possible ways of distinguishing between Congress' Fourteenth Amendment power and its Article I powers. The first approach assumes that the force limiting Congress' power to create a cause of action for money damages enforceable against an unconsenting state in federal court is the Eleventh Amendment; the second focuses on the limitations imposed by state sovereignty.
 
 
 13
 We first consider whether Congress' Fourteenth Amendment power may be distinguished because the amendment constituted a limited "repeal" of restrictions that the Eleventh Amendment placed on congressional power or federal court jurisdiction. In this view, when Congress acts under its Fourteenth Amendment power, or the federal courts enforce a cause of action created by Congress pursuant to its Fourteenth Amendment power, they are not constrained by limitations that the Eleventh Amendment imposes in cases in which Congress acts under its Article I powers. However, because we find that the Eleventh Amendment did not limit the power of Congress or the federal question jurisdiction of the federal courts, we conclude that there was no limitation for the Fourteenth Amendment to repeal. We therefore reject this distinction.
 
 
 14
 The second possibility that we consider is that Congress' plenary power under the Fourteenth Amendment may be distinguished because Congress may displace state authority more completely when it acts under the Fourteenth Amendment than it may when it exercises its Article I powers. This view recognizes that state sovereignty--rather than the Eleventh Amendment--limits the power of Congress to create a cause of action enforceable against an unconsenting state in federal court.
 
 
 15
 We consider two ways in which Congress' Fourteenth Amendment power may be distinguished from its Article I powers under a state sovereignty rationale. The first possibility is that Congress may create causes of action that may impose monetary burdens on the states when Congress acts under its plenary Fourteenth Amendment power, but not when it acts under the plenary Article I powers, because the Fourteenth Amendment is an "ultraplenary" grant of power that allows Congress to impose burdens on the sovereign states that it could not impose burdens on the sovereign states that it could not impose when it acts under its Article I powers. Because we believe that the extent of Congress' power to impose its will on the states can be no greater under one plenary power than under another, we reject this distinction. The second possible distinction that we consider is that Congress may make causes of action against a state enforceable in federal court when Congress acts under its Fourteenth Amendment power, but not when it acts under its Article I powers, because the Fourteenth Amendment displaces a limit that state sovereignty imposes on federal court jurisdiction in cases in which the federal courts are enforcing causes of action created under that amendment. Because we believe that state sovereignty imposes no limitation on Article III, we conclude that there is no restriction for the Fourteenth Amendment to displace. We therefore reject this distinction.
 
 
 16
 Having rejected the two possible bases for distinguishing Congress' Fourteenth Amendment power from its Article I powers, we conclude that because Congress may create a cause of action for money damages enforceable against an unconsenting state in federal court under its Fourteenth Amendment power, it may do so under any of its plenary powers.
 
 
 17
 1. THE FOURTEENTH AMENDMENT AS A "REPEAL" OF AN ELEVENTH AMENDMENT LIMIT ON FEDERAL POWERER
 
 
 18
 The first possible basis for distinguishing Congress' Fourteenth Amendment power from its Article I powers assumes that the Eleventh Amendment limited congressional power and federal jurisdiction. This approach seeks to distinguish the Fourteenth Amendment on the grounds that it "repealed," to a limited extent, the restrictions imposed by the Eleventh Amendment. In this view, the Eleventh Amendment may have limited the Article I power of Congress to create a cause of action for money damages against a state. The Amendment may also have restricted the Article III power of the federal courts to adjudicate such suits. If the Eleventh Amendment imposed such limitations, then the Fourteenth Amendment could be distinguished by viewing it as a limited repeal of those restrictions. Such a limited "repeal" would allow Congress to create a cause of action for money damages enforceable against an unconsenting state in federal court only when it acts under its Fourteenth Amendment power.
 
 
 19
 The Supreme Court has never discussed the "repeal" analysis. However, the Court has given no indication that the chronological relation between the Eleventh Amendment and the Fourteenth Amendment is significant. Because we do not believe that the Eleventh Amendment limits either the Article I power of Congress or the Article III power of the federal courts to adjudicate cases arising under federal law, we conclude that the Eleventh Amendment imposed no limitation for the Fourteenth Amendment to repeal. We therefore reject this approach.
 
 
 20
 a. THE ELEVENTH AMENDMENT AND CONGRESSIONAL POWER. The Eleventh Amendment does not limit the Article I powers of Congress. There is no indication in the text or history of the Eleventh Amendment that its framers intended to curtail Congress' powers. Rather, the language of the Amendment makes clear that it is a limit on the power of the federal courts to interpret Article III. The amendment does not say that "Congress shall make no law...." Instead, the amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State...." U.S. Const.Amend. 11 (emphasis added).
 
 
 21
 The framers of the Eleventh Amendment used the word "construe" because they wanted to limit the branch charged with "construing" the Constitution--the judiciary. The Eleventh Amendment was enacted, not to limit congressional power, but to overrule the decision of the Supreme Court in Chisolm v. Georgia, 2 U.S. (2 Dall.) 419 (1793). See Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) ("The [Eleventh] Amendment's language overruled the particular result in Chisolm...."); Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); Ex parte New York, 256 U.S. 490, 497-98, 41 S.Ct. 588, 589-90, 65 L.Ed. 1057 (1921); Hans v. Louisiana, 134 U.S. 1, 11, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890). The Chisolm Court had "construed" the diversity provisions of Article III--which extends the judicial power of the United States "to Controversies ... between a State and Citizens of another State"--to make states amenable to suits in every case in which they were sued by citizens of another state. As the language indicates, the purpose of the Eleventh Amendment was to bar a judicial construction like the one in Chisolm in the future. The Amendment simply makes clear that Article III does not itself abrogate the presumptive immunity from suit that states enjoy. See Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv.L.Rev. 682, 693-99 (1976). However, the Amendment does not prevent Congress, acting under its Article I powers, from displacing that presumptive immunity by creating a cause of action against a state.
 
 
 22
 b. THE ELEVENTH AMENDMENT AND FEDERAL COURT JURISDICTION. The Eleventh Amendment is often conceptualized as a limitation on the Article III power of the federal courts. See, e.g., Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) (The Eleventh Amendment "is a constitutional limitation on the federal judicial power established in Article III."); Jensen v. Board of Tax Commissioners, 763 F.2d 272, 276 (7th Cir.1985). This formulation highlights the "special and specific position in our constitutional system," Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 556, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1985), that the states occupy. However, the Eleventh Amendment is not a general limitation on the judicial powers of the federal courts to adjudicate cases arising under federal law.
 
 
 23
 The Eleventh Amendment may limit the judicial power of the federal courts to adjudicate state law suits in which a state is a party. It is possible that the Eleventh Amendment was adopted to make clear that the diversity provision of Article III allowing suits "between a State and a Citizen of another State" was intended to allow a federal court to hear a state law suit only when the suit was brought by the state against citizens of other states. See Fletcher,A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather Than a Prohibition Against Jurisdiction, 35 Stan.L.Rev. 1033 (1983). However, because this case is brought under the federal question jurisdiction, we need not now decide what limitation, if any, the Eleventh Amendment places on the diversity jurisdiction.
 
 
 24
 Even if the Eleventh Amendment does limit the diversity jurisdiction, nothing on the face of the amendment suggests that it modifies the Article III federal question jurisdiction. Article III states that "The judicial Power [of the United States] shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States...." U.S. Const. Art. III Sec. 2 (emphasis added). As the Supreme Court made clear a quarter century after the enactment of the Eleventh Amendment, Article III authorizes the "judicial department ... to decide all cases of every description, arising under the Constitution or laws of the United States. From this general grant of jurisdiction, no exception is made of those cases in which a state may be a party." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 380 (1821).
 
 
 25
 Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), is often cited for the proposition that the Eleventh Amendment bars a federal court from taking cognizance of a suit for money damages brought by a citizen against his or her own state even if the citizen's claim "arises under" federal law. See e.g., Pennhurst, 465 U.S. at 98, 104 S.Ct. at 906. However, nothing in that opinion requires such a broad reading. Hans was, in essence, a breach of contract suit brought by a citizen of Louisiana against his home state. Because there was no diversity of citizenship, the plaintiff sought to maintain the action in federal court by pleading his claim as a suit arising under the Contracts Clause of the Constitution, U.S. Const. Art. 1 Sec. 10, Cl. 1. However, no statute specifically created a cause of action against a state under the Contracts Clause. Hans therefore brought his suit under the general provisions of the Judiciary Act of 1875, 18 Stat. 470, which had for the first time vested the federal courts with jurisdiction to hear suits arising under the Constitution and the laws of the United States.
 
 
 26
 The Hans case created a dilemma for the Supreme Court. Had Hans brought his breach of contract suit against another state under the diversity jurisdiction, the Court would certainly have held that the Eleventh Amendment barred the action. To allow Hans to bring the same action against his own state would have been anomalous. Rather than sanction this anomaly, the Court held that Hans could not bring his suit.
 
 
 27
 The Hans Court did not rely on the Eleventh Amendment to reach its result. It would have been difficult for the Court to argue that the Eleventh Amendment, which was ratified at a time when the federal courts had no federal question jurisdiction, was intended to restrict that jurisdiction. Instead, the Court relied on the concept of state sovereign immunity, observing that "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the sovereign's] consent. This ... attribute of sovereignty ... is ... enjoyed by the government of every state of the Union." Hans, 134 U.S. at 13, 10 S.Ct. at 506 (quoting The Federalist No. 81 (A. Hamilton)) (emphasis omitted).
 
 
 28
 Hans thus stands for the proposition that, as a sovereign, a state is presumptively immune from suit in a federal court even if the cause of action arises under federal law. The Hans Court did not consider the broader question of whether Congress, acting pursuant to its plenary powers, could expressly displace this presumptive immunity. All that is certain from Hans is that the general provisions of the Judiciary Act of 1875, which did not expressly provide for federal question suits against states by individuals, did not displace this presumptive immunity.
 
 
 29
 Thus, the Eleventh Amendment did not limit any aspect of Congress' Article I powers or the Article III federal question jurisdiction. Therefore, there was no restriction for the Fourteenth Amendment to "repeal." Consequently, Congress' Fourteenth Amendment power cannot be distinguished from its Article I powers on the grounds that it is a limited repeal of restrictions imposed by the Eleventh Amendment.
 
 
 30
 2. THE FOURTEENTH AMENDMENT AS AN "ULTRA-PLENARY" GRANT OF POWER TO ABROGATE STATE SOVEREIGNTYTY
 
 
 31
 The second possible basis for distinguishing Congress' Fourteenth Amendment power from its Article I powers recognizes that state sovereignty--rather than the Eleventh Amendment--limits Congress' ability to create a cause of action for money damages enforceable against an unconsenting state in federal court. This approach seeks to distinguish the Fourteenth Amendment on the grounds that the constitutional grant of power to Congress to displace state authority is greater under the Fourteenth Amendment than under Article I.
 
 
 32
 We first consider the limitation that state sovereignty places on Congress to create a cause of action for money damages enforceable against a state. We conclude that Congress may only create such a cause of action when it acts pursuant to a plenary grant of power. However, because both Article I and the Fourteenth Amendment are plenary grants of power, it is not possible to distinguish between the two on this basis. We next consider the limitation that state sovereignty places on the ability of Congress to empower the federal courts to issue an enforceable order in such a suit. We conclude that state sovereignty does not limit the Article III power of the federal courts. Therefore, it is not possible to distinguish the Fourteenth Amendment on the basis that it provides a unique grant of power to displace a limitation that state sovereignty places on Article III.
 
 
 33
 a. THE LIMITATION IMPOSED BY STATE SOVEREIGNTY. The Eleventh Amendment has often been "used as a shorthand for the principle that a state may not be sued by either its citizens or citizens of another state." Connecticut Performing Arts Foundation v. Brown, 47 B.R. 911, 915 (D.Conn.1985). However, the Supreme Court has observed that the actual reason a state may not generally be brought into federal court against its will is that "states of the union still possess[ ] attributes of sovereignty ... save where there has been 'a surrender of the immunity in the plan of the [constitutional] convention.' " Principality of Monaco v. Mississippi, 292 U.S. 313, 322-23, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1933) (quoting The Federalist, No. 81 (A. Hamilton)) (footnote omitted). As sovereigns, states are entitled to the presumption of immunity. However, because the states have delegated some of their sovereign powers to the national government, this immunity is not absolute. Nonetheless, because the states have not delegated all of their sovereign powers, the power of Congress to displace the states' presumptive immunity by creating a cause of action against them is not unlimited.
 
 
 34
 State sovereignty may limit the power of Congress to create a cause of action for money damages enforceable against an unconsenting state in federal court in either of two ways. First, state sovereignty may limit the Article I power of Congress to impose a monetary obligation on an unconsenting state by creating a cause of action against it for money damages. Second, state sovereignty may limit the Article III power of the federal courts to issue an enforceable order requiring a state to pay a damage award in such a suit. In either case, the Fourteenth Amendment could be distinguished if it granted Congress or the federal courts more power to displace state sovereignty than they possess in cases in which Congress creates causes of action under its Article I powers.
 
 
 35
 b. STATE SOVEREIGNTY AND CONGRESSIONAL POWER. State sovereignty limits the power of Congress to create a cause of action against a state. The Tenth Amendment makes clear that if the states have not delegated plenary power to Congress in a given area, Congress may not impose obligations--including the obligation to spend public funds--on the states. In effect, when Congress creates a cause of action for money damages enforceable against a state, it is imposing an obligation (or at least a potential obligation) on the states to expend public funds. See Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum.L.Rev. 1413, 1441 (1975). Therefore, if the states have not delegated plenary power to regulate a given area, state sovereignty bars Congress from creating a cause of action against a state in that area.
 
 
 36
 In contrast to the situation in which Congress lacks plenary power, when Congress acts in the exercise of one of its delegated plenary powers, state sovereignty generally imposes no limits on Congress' ability to impose obligations on the states. In Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Supreme Court considered the ability of Congress, acting under the plenary grant of power in the Commerce Clause, U.S. Const. Art. I Sec. 8, Cl. 3, to impose a monetary obligation on a state by requiring it to pay overtime wages to some public workers. Although the imposition is less direct when Congress creates a cause of action enforceable against a state, the underlying issue--the limitation that state sovereignty imposes on congressional power--is identical.
 
 
 37
 The Garcia Court held that the test of congressional power to impose financial burdens on a state is simply whether the Constitution has "divested [the states] of their original powers and transferred those powers to the Federal Government." Garcia, 467 U.S. at 549, 105 S.Ct. at 1017. If Congress has the power, the Court held, state sovereignty imposes no limit on Congress' ability to exercise it. As the Court explained, "the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace." Id. at 550.
 
 
 38
 Just as state sovereignty does not preclude Congress, acting under its plenary powers, from imposing a monetary obligation directly on a state, state sovereignty does not prevent Congress, when acting under its plenary powers, from imposing a monetary burden on a state by creating a cause of action enforceable against it. This was made clear in Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), in which the Supreme Court concluded that the plenary grant of power in the Fourteenth Amendment empowered Congress, in enacting Title VII, to create a cause of action enforceable against a state.
 
 
 39
 Like the Fourteenth Amendment, Article I is a plenary grant of power. Therefore, because Congress may impose the burden of potential money damages on the states when it acts under its Fourteenth Amendment power, it should also be able to do so under its Article I powers. Nonetheless, language in the Fitzpatrick opinion suggests a possible basis for distinguishing Congress' Fourteenth Amendment power. In Fitzpatrick, the Court observed that Congress, in acting under Sec. 5 of the Fourteenth Amendment, was "exercising legislative authority that is plenary within the terms of the constitutional grant ... under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority." Fitzpatrick, 427 U.S. at 456, 96 S.Ct. at 2671. The language in Fitzpatrick could be read to suggest that each grant of power contained in the Constitution must be linked to a provision that, "by [its] own terms," id., limits state authority in order for Congress, acting under that power, to create a cause of action for money damages against a state. If this is so, then when Congress acts under its Article I powers, which are not expressly yoked to limitations on state authority, it cannot create a cause of action for money damages against an unconsenting state.
 
 
 40
 The lack of an express limit on state authority in Article I does not provide an adequate basis for limiting Congress' power to create a cause of action for money damages against a state to actions taken by Congress under the Fourteenth Amendment. Both Article I and the Fourteenth Amendment are plenary grants of power to Congress. By definition, any grant of power to Congress that is "plenary" is, ipso facto, a "limitation[ ] on state authority." Fitzpatrick, 427 U.S. at 456, 96 S.Ct. at 2671. If the states have delegated plenary power to Congress then Congress may "exercise it, although it should interfere with the laws, or even the Constitution of the States." 2 Annals of Cong. 1897 (1791) (quoting J. Madison). There is nothing talismanic about the appearance of the word "state" on the face of the Constitution; its appearance in the Fourteenth Amendment does not make that power "more plenary" than Congress' plenary Article I power. There is, therefore, no basis to conclude that the plenary power of the Fourteenth Amendment grants Congress any more power to bring an unconsenting state into federal court than does the plenary power of Article I.[4] Consequently, Congress' Fourteenth Amendment power may not be distinguished from its Article I powers on this basis.
 
 
 41
 c. STATE SOVEREIGNTY AND FEDERAL JUDICIAL POWER. Even if Congress may create a cause of action against a state under its Article I powers, if state sovereignty limits the Article III power of the federal courts to issue an enforceable order requiring a state to pay money damages, then Congress may not make the cause of action enforceable in a federal court.[5] However, we do not believe that state sovereignty limits Article III. We therefore conclude that in those areas in which Congress may create a cause of action for money damages enforceable against a state, state sovereignty does not bar a federal court from enforcing it.
 
 
 42
 The Supreme Court has often employed language that suggests that state sovereignty imposes a limit on the Article III power of the federal courts. See, e.g., Pennhurst, 465 U.S. at 98, 104 S.Ct. at 907. Despite such broad language, however, the Supreme Court's decisions not to assert federal judicial authority over the states appear to be based on principles of comity. Although such abstention is often highly desirable in a federal system, it does not appear to be constitutionally mandated. Therefore, when Congress acts under its plenary powers, it may authorize the federal courts to enter money judgments against the states.
 
 
 43
 The Supreme Court has considered the relationship between sovereignty and judicial power in cases in which one sovereign seeks to assert judicial jurisdiction over a coequal sovereign. In The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), the Court made clear that the sovereignty of a foreign nation, in that case France, was not a limitation on the judicial power of the United States. Id. at 136. "The jurisdiction of the nation," the Court explained, "is susceptible of no limitation, not imposed by itself." Id. The reason that France, a sovereign nation, was immune to suit in the federal courts was that the courts, in the interest of comity, chose to abstain from asserting jurisdiction. Similarly, in Nevada v. Hall, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), the Court made clear that the sovereignty of one state, Nevada, was not a limitation on the judicial power of another state, California. Rather, "Nevada's claim of immunity from suit in California's courts [was] to be answered by reference to the law of California." Id. at 417, 99 S.Ct. at 1186. If Nevada was immune to suit in the courts of California, the Supreme Court explained, it was either because of "an agreement between ... the two sovereigns, or ... a voluntary decision of the second to respect the dignity of the first as a matter of comity." Id. at 416. If sovereignty is not a limitation on judicial power when one sovereign seeks to assert its judicial power over a coequal sovereign then, a fortiori, sovereignty should be no limit on judicial power when a superior sovereign--the federal government--seeks to assert its judicial power over an inferior sovereign--a state.
 
 
 44
 Supreme Court cases demonstrate that Article III allows a federal court to issue an enforceable order that directly effects a sovereign state. A federal court may enjoin a state from violating the federal constitutional rights of its citizens. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). A federal court may also enjoin a state in cases in which the state's officers have acted without any state authority. Florida Department of State v. Treasure Salvors, Inc., 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982); Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The only requirement is that these suits must be styled as actions against state officers. These cases rely on the admitted fiction that the court order is against the state officer, not against the state. However, because "an American state can only act through its officials," Pennhurst, 465 U.S. at 114 n. 25, 104 S.Ct. at 915 n. 25 (1984), the orders in such cases are undeniably against the state.
 
 
 45
 The Supreme Court has not permitted the federal courts to enjoin all unlawful state activity. In Pennhurst, the Court held that a federal court may not issue an injunction against a state whose officers have acted in violation of state law. This decision does not appear to reflect a limitation on Article III. The Court conceded that there was no "principled basis," Pennhurst, 465 U.S. at 114 n. 25, 104 S.Ct. at 915 n. 25, for distinguishing between permissible suits against a state, like Larson and Treasure Salvors, in cases in which the state's officers acted with no state authority, and impermissible suits against a state, like Pennhurst, in cases where the state's officers had acted in violation of state authority. The Court justified its distinction by the need to draw the line somewhere in order to protect state sovereignty. Id. However, if state sovereignty imposed a constitutional limit, all suits against states--including suits to enjoin federal constitutional violations--would have to be barred. The fact that the Court was able to impose an admittedly arbitrary distinction strongly suggests that principles of comity, rather than strict constitutional restraints, underlie the decisions of the Supreme Court not to assert federal jurisdiction against the states in certain circumstances.
 
 
 46
 The relatively recent decisions of the Supreme Court limiting relief in "state officer" suits like Ex parte Young or Larson to prospective relief, see, e.g., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), also reflect a pragmatic effort at line-drawing rather than a limitation on Article III. If state sovereignty limited the constitutional ability of a federal court to issue an order imposing money damages on the states, then a federal court could never impose such damages on a state. Yet, the Supreme Court has never doubted that "if a state waives its immunity and consents to suit in federal court," Atascadero, 105 S.Ct. at 3145, the court may award money damages against it. See Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part I, 126 U.Pa.L.Rev. 515, 524-25 (1975).
 
 
 47
 The fact that Article III allows a federal court to issue orders that have a direct effect on the treasuries of unconsenting states is vividly demonstrated in the bankruptcy area. The Supreme Court has long held that a judicial decree of a federal bankruptcy court can affect the financial interests of an unconsenting state government. Thus, in Gardner v. New Jersey, 329 U.S. 565, 578, 67 S.Ct. 467, 91 L.Ed. 504 (1947), the Court held that a bankruptcy court could void a tax lien held by a state. See also Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931) (same). A tax lien, like a claim for the proceeds of its bank accounts, is an asset of a state treasury. Voiding a lien is little different from ordering the state treasurer to pay over a portion of the contents of the state's bank account. If Article III allows a court to take the former action, it must certainly allow the latter.
 
 
 48
 The fact that, when Congress acts under the Fourteenth Amendment, it may require the federal courts to impose monetary damages on a state, Fitzpatrick, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 further convinces us that there is no constitutional limit on the ability of a federal court to impose money damages on a state. The Fourteenth Amendment makes no reference to the judicial power of the United States. There is no basis to conclude that the Fourteenth Amendment's express grant of power to Congress also contained an implicit grant of power to the federal courts. Therefore, if state sovereignty limited Article III, a federal court could not hear a suit against a state for money damages even if the cause of action was created under Congress' Fourteenth Amendment power. That, however, is not the case.
 
 
 49
 We therefore conclude that state sovereignty does not limit the Article III power of a federal court to order a state to pay money damages. Consequently, there is no limitation on federal judicial power for the Fourteenth Amendment to displace. As a result, it is not possible to distinguish Congress' Fourteenth Amendment power from its Article I powers by arguing that Congress may displace the limitation that state sovereignty places on federal judicial power more completely when it acts under its Fourteenth Amendment power. Rather, we must conclude that because Congress can make a cause of action for money damages against a state enforceable in the federal courts when Congress acts under its Fourteenth Amendment power, it can do so under any plenary power.
 
 
 50
 In light of the above, we conclude that this court was correct in Jennings: the Fourteenth Amendment is not the only constitutional provision under which Congress may require a state to submit to federal jurisdiction. Congress may abrogate state immunity to suit pursuant to any of its plenary powers.
 
 C.
 
 51
 In enacting Sec. 547(b) of the Bankruptcy Code, 11 U.S.C. Sec. 547 (1982), Congress was plainly exercising its power "t[o] establish ... uniform laws on the subject of Bankruptcies," U.S. Const. Art. 1 Sec. 8, Cl. 4. When Congress acts pursuant to the Bankruptcy Clause, it is exercising a plenary power. See International Shoe Co. v. Pinkus, 278 U.S. 261, 265, 49 S.Ct. 108, 110, 73 L.Ed. 318 (1929) ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount.... States may not ... interfere...."). Therefore, in enacting Sec. 547(b) Congress had the power to create a cause of action for money damages enforceable against an unconsenting state in federal court. The question then becomes whether, in enacting this provision, Congress intended to use its constitutional power.
 
 III
 A.
 
 52
 Normally, in interpreting a statute, we look to the face of the statute and to the accompanying legislative history. We then determine, in light of this evidence, what we believe Congress intended. See, e.g., Larimore v. Comptroller of the Currency, 789 F.2d 1244 (7th Cir.1986) (en banc). However, the Illinois Secretary of State, the defendant-appellee in this action, argues that the Supreme Court's decision in Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), demands that we take a different approach in cases involving congressional creation of a cause of action against a state.
 
 
 53
 In Atascadero, the Supreme Court held that Sec. 794 of the Rehabilitation Act, 29 U.S.C. Sec. 504 (1982), which bars employment discrimination by federal fund recipients against the disabled, did not create a cause of action for money damages by an individual who claimed that a state that was receiving federal funds had discriminated against him on the basis of his physical disability. The Court, noting that the statute only provided for suits against "any recipient" of federal funds, held that this was insufficient to enable the court to be "certain" that Congress had intended to create a cause of action against a state. Atascadero, 105 S.Ct. at 3147-49. The Court explained that because Congress had not provided for suits against states "in the statutory language," it could not be "certain" of congressional intent. Id. at 3148. The Court did not discuss the legislative history of the Rehabilitation Act.
 
 
 54
 The Secretary contends that, under Atascadero, we can only find that Congress created a cause of action against a state if the statute, on its face, expressly provides for suits against a state. If the face of the statute can be read in any other conceivable manner, the Secretary insists that we must hold that it does not allow for a suit against a state. Moreover, we are told by the Secretary that we are precluded, under Atascadero, from seeking guidance as to congressional intent in the pages of the legislative history. We cannot accept this view.
 
 
 55
 The Supreme Court has stated repeatedly that the federal courts must employ a somewhat higher standard of proof than is usual in cases of statutory interpretation in cases in which we assess whether Congress intended to create a cause of action enforceable against a state. The Court has used various formulations to describe this heightened scrutiny. At a minimum, it is clear that "a general authorization for suit in federal court is not ... sufficient" to create a cause of action for money damages enforceable against a state in federal court. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985). Rather, there must be "an unequivocal expression of congressional intent." Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). The Court has recently stated that Congress must "express its intention ... in the statute itself." Atascadero, 105 S.Ct. at 3148. However, the Court has not, in practice, always required Congress to do so. See Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (Civil Rights Attorney's Fees Award Act held to permit award of fees against states). Indeed, in its most recent opinion on the subject, the Court may have retreated from this view. See Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 425-26, 88 L.Ed.2d 371 (1985) (no "face of the statute" requirement specified).
 
 
 56
 The precise test to be used to determine whether Congress has created a cause of action against a state thus remains unclear. However, we believe that the Court captured the essence of the test in one sentence of the Atascadero opinion: "it is incumbent upon the federal courts to be certain of Congress' intent." Atascadero, 105 S.Ct. at 3148 (emphasis added). Therefore, in seeking to determine whether Congress created a cause of action against a state, we will follow our usual procedure and look first to the face of the statute. If the words of the statute make no reference to a suit against a state, it is highly unlikely that we can be "certain" that Congress intended to create such a cause of action. However, especially where the statute expressly provides for a suit against a state, we will not hesitate to consult the legislative history to resolve any lingering uncertainty. See Gomez v. Illinois Board of Education, 811 F.2d 1030, 1036-37 (7th Cir.1987); cf. Cannon v. University of Chicago, 41 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979) (In determining the existence of a private right of action, a court should seek to give effect to congressional intent. However, "[w]hen Congress intends private litigants to have a cause of action ... the far better course is for it to specify as much....").
 
 
 57
 The requirement of "certainty" has important constitutional underpinnings. The Supreme Court has explained that members of Congress play a paramount role in protecting the interests of the states from federal encroachment. See Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 550-54, 105 S.Ct. 1005, 1017-20, 83 L.Ed.2d 1016 (1985). The requirement that we be "certain" of Congress' intent is designed to prevent us from casually attributing to Congress the intention of imposing on the states the burden of potential liability in suits for money damages.[6] This insures that we will not upset "the fundamental constitutional balance between the Federal Government and the States." Atascadero, 105 U.S. at 3145-46. At the same time, however, we must remember that our goal here, as in any effort at statutory interpretation, is "to construe the language [of the statute] so as to give effect to the intention of Congress." United States v. American Trucking, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). For if a court "thinking to maintain the 'fundamental constitutional balance between the Federal Government and the States' fails to implement the plain intent of Congress, it upsets another fundamental constitutional balance: the balance between the legislature and the judiciary." Note, Congressional Abrogation of State Sovereign Immunity, 86 Colum.L.Rev. 1436, 1448 (1986). See generally Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States, 126 U.Pa.L.Rev. 1203, 1272-77 (1978) (The Supreme Court's interpretive rules would be constitutionally unacceptable if interpreted "to prevent the judiciary from finding causes of action against the states in situations where all the circumstances suggest that such causes of action are within the statutory purpose.").
 
 
 58
 The Supreme Court has never failed to give effect to the clear intent of Congress to create a cause of action against a state. Whenever the Court has held that a state may not be sued for money damages in a federal court, it has been because the Justices could not be "certain" that Congress intended to subject the state to suit. Thus, in Employees of the Department of Public Health and Welfare v. Missouri, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Court concluded that the Fair Labor Standards Act did not create a cause of action against a state because the statute did no more than provide for suit against "any employer," id. at 283, 93 S.Ct. at 1617 and because the Court "found not a word in the [legislative] history ... [that Congress intended] to make it possible for ... citizen[s] ... to sue the State in the federal court," id. at 285, 93 S.Ct. at 1618. Similarly, the Court's conclusion in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), that Sec. 1983 did not create a cause of action for money damages against a state was based on the fact the legislative history was "silen[t]" as to the possibility that Congress intended to allow such suits. See Quern v. Jordan, 440 U.S. 332, 342-43, 99 S.Ct. 1139, 1145-46, 59 L.Ed.2d 358 (1979).
 
 
 59
 The Court was also guided by congressional intent in Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In that case, the Court rejected the state's argument that, although Congress had intended to provide for an award of attorneys' fees by prevailing parties in civil rights suits against the states, it had "botched the job" by not using express language on the face of the statute. See 46 U.S.L.W. 3535-36 (1978) (describing oral argument). The Court found that "[t]he legislative history [was] ... plain.... '[Congress] intended that attorney's fees [would] be collected ... from the state....' " Hutto v. Finney, 437 U.S. at 694, 98 S.Ct. at 2575 (quoting S.Rep. No. 94-1101 at 5 (1976), reprinted in 1976 U.S. Code Cong. & Admin.News 5908, 5913). Accordingly, the Court gave effect to the legislative purpose.
 
 
 60
 The decision of the Supreme Court in Atascadero is fully consistent with its prior opinions. In determining that Sec. 504 of the Rehabilitation Act did not create a cause of action against a state, the Court observed that the statute provided only a general authorization for suit against any federal fund recipient. Atascadero, 105 S.Ct. at 3149. Although the Court did not discuss the legislative history, there was little need to do so. Proponents of the position that Congress had intended to create a cause of action against the states were not able to cite any legislative history demonstrating that Congress had specifically considered the issue and intended to allow such suits. See id. at 3151-53 (Brennan, J., dissenting). As a result, there was simply no way that the Court could be "certain" that Congress had intended to create such a cause of action.
 
 
 61
 In light of the above, we conclude that if the words of the statute and the legislative history, taken together, are sufficient to make us "certain" that Congress intended to create a cause of action against a state, we are duty-bound to give effect to that desire.
 
 B.
 
 62
 In the present case, our inquiry begins with the clear language of the statute. Section 547(b) provides that a debtor in possession may bring suit in federal court to "avoid any transfer of an interest in property ... to or for the benefit of a creditor." 11 U.S.C. Sec. 547(b) (1982 & 1985 Supp.).[7] Section 106(c) of the Code, 11 U.S.C. Sec. 106(c) (1982), makes unmistakeably clear that "a provision of [the Bankruptcy Code] that contains 'creditor' ... applies to governmental units and ... a determination by the court of an issue arising under such a provision binds governmental units." Id. Section 101(21) of the Code, 11 U.S.C. Sec. 101(21) (1982), further defines a "governmental unit" to include a "State." Id.
 
 
 63
 The Secretary of State correctly observes that Sec. 547(b) does not itself use the word "State." However, in seeking to construe a statute, we do not view any provision in isolation. Rather, we seek to understand a given provision by determining how it fits into the larger statute of which it is a part. See, e.g., Water Quality Ass'n v. United States, 795 F.2d 1303, 1306-08 (7th Cir.1986). The Supreme Court has only recently reminded us of the importance of taking such an integrated view when interpreting the Bankruptcy Code. See Kelly v. Robinson, --- U.S. ----, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986). We see no reason to depart from that approach in this case. There is no reason to conclude that Congress' decision to employ general definitions in Sec. 101(21) and Sec. 106(c), and to make these definitions applicable to numerous specific provisions, including Sec. 547(b), renders the statute constitutionally inadequate. On the contrary, the express language of the statute, standing alone, is sufficient to make us "certain" that Congress intended to create a cause of action against a state.
 
 
 64
 Notwithstanding the clear statutory language, the Secretary of State suggests two possible constructions of Sec. 106(c) that could, conceivably, be read to mean that that section, and therefore Sec. 547(b) which it defines, was not intended to provide for suits against a state. Both contentions are easily dismissed.
 
 
 65
 The Secretary first contends that the general sovereign immunity provision, Sec. 106(c), seeks only to create causes of action against the federal government in those provisions using the word "creditor." This view is difficult to support. Section 106(c) provides that a provision of the Bankruptcy Code that contains the word " 'creditor' ... applies to governmental units." If Congress intended to limit coverage to the federal sovereign it would presumably have used the singular form. Furthermore, it is difficult to see why Congress would define "governmental unit" to include states in Sec. 104(21), but then use the plural of that term to refer only to the federal government in Sec. 106(c).
 
 
 66
 The Secretary of State correctly observes that several of the bankruptcy courts that have considered this question have concluded that Sec. 106(c) applies only to the federal government. See, e.g., Cohen v. Illinois Dept. of Public Aid (In Re Ramos), 12 B.R. 250 (Bankr.N.D.Ill.1981). The Secretary contends that the divergence of opinion among the bankruptcy courts as to whether Sec. 106(c) applies to states is, itself, enough to preclude us from ever being "certain" of Congress' intent. We do not agree. The existence of divergent opinions among other courts does not preclude this court from being "certain" of Congress' intent. The better reasoned cases argue convincingly that Sec. 106(c) applies to the states. See, e.g., Matter of Willington Convalescent Home, 39 B.R. 781 (Bankr.D.Conn.1984).
 
 
 67
 The Secretary also suggests that if we read Sec. 106(c) to create a cause of action against a state in provisions using the term "creditor," we will render Sec. 106(a) and Sec. 106(b), which allow for suit against a state that has brought a claim against a debtor, superfluous.[8] The Secretary argues that if Sec. 106(c) makes states generally amenable to suit, Congress would have had no reason to provide that states were amenable under the more limited circumstances of Sec. 106(a) and Sec. 106(b). A prior case in this circuit forecloses this argument. In Matter of Neavear, 674 F.2d 1201, 1204 (7th Cir.1982) we made clear that Sec. 106(a) and Sec. 106(b) concern cases in which a state, by filing a proof of claim, consents to have claims adjudicated by the bankruptcy court. In contrast, Sec. 106(c) refers to cases, like the present one, in which Congress seeks to create a cause of action against an unconsenting state.[9]
 
 
 68
 In light of the clear statutory language, we need not rely on the legislative history. However, if we had any lingering doubt--which we do not--the legislative history would put it to rest. An explanatory statement, read to both houses during debate, establishes that Sec. 106(c) was intended, inter alia, to make clear that Sec. 547(b) "permits a ... debtor in possession to assert avoiding powers under Title 11 against a governmental unit." 124 Cong.Rec. 32,394 (Rep. Edwards) (1978); id. at 33,993 (Sen. DeConcini) (1978). See generally Matter of Willington Convalescent Home, 39 B.R. 781, 786-88 (Bankr.D.Conn.1984) (providing a detailed description of the legislative history of Sec. 106(c)). We will not distort our obligation to be "certain" of Congress' intent into an invitation to thwart Congress' will.
 
 
 69
 In light of the express statutory language and the indisputable evidence contained in the legislative history, we are "certain" that in enacting Sec. 547(b), as defined by Sec. 101(21) and Sec. 106(c), Congress intended to create a cause of action for money damages enforceable against a state in federal court.
 
 III
 
 70
 We are aware that the result that we have reached may appear to be at odds with the expansive language that the Supreme Court has often employed in discussing the Eleventh Amendment and sovereign immunity. However, we believe that if faced with the question that is before us, the Supreme Court would reach the same result that we do. To hold that the Eleventh Amendment wiped out all congressional power then existing to make states amenable to suit in federal court--even though the words of the amendment cannot support such an interpretation and the history of the amendment refutes it--would be an extraordinary step which we doubt the Court would take. To hold that, absent constitutional amendment, federal supremacy must always give way to state sovereign immunity would be equally remarkable.
 
 
 71
 If we were to conclude that Congress may not create a cause of action for money damages enforceable against a state in federal court, we would be obligated to overrule our decision in Jennings and create a split among the circuits. We would also have no choice but to hold that Sec. 547(b) is unconstitutional. Were we to do so, this would severely impair Congress' plenary power to regulate bankruptcies. If the federal courts were not able to order a state to turn over assets to a bankruptcy estate, then any state owed money by a debtor having financial problems would have a strong incentive to collect whatever funds it believed to be due as rapidly as possible--even if this pushed the debtor into insolvency--rather than risking the possibility of recovering only a portion of their debt in any subsequent bankruptcy proceedings. In effect, we would be holding that the Constitution makes a state a preferred creditor in every bankruptcy. The very existence of this power would doubtless encourage other creditors to accelerate their collections. The end result would be an increase in bankruptcies and a distortion of the system of preferences that Congress has carefully crafted. We seriously doubt that either the Eleventh Amendment or the doctrine of sovereign immunity demands such a fundamental disruption of the bankruptcy system. Given such doubt, we decline to hold Sec. 547(b) unconstitutional.
 
 
 72
 The decision of the district court is therefore REVERSED and the case is REMANDED to the bankruptcy court for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation
 
 
 [1]
 Under state law, the entire tax apparently was due in advance. McVey, however, made a 50 per cent "down payment" to the state
 
 
 [2]
 This section gives Congress the "power to enforce ... by appropriate legislation" the substantive provisions of the Fourteenth Amendment
 
 
 [3]
 The ability of Congress to create a cause of action for money damages enforceable against an unconsenting state in federal court is sometimes phrased as a question of whether Congress may abrogate state sovereign immunity (sometimes less precisely called "Eleventh Amendment" immunity) to suit. These are, in actuality, two ways of stating the same question. However, the former terminology makes clear that there are two distinct issues involved: Congress' Article I power to impose the burden of potential liability for money damages on the states, and the federal courts' Article III power to adjudicate such suits. This formulation also puts the focus where it belongs--on the extent of the delegated powers of the federal government. This focus recognizes that "we have no license to employ freestanding conceptions of state sovereignty in measuring congressional authority," Garcia v. San Antonio Transit Authority, 469 U.S. 528, 550, 105 S.Ct. 1005, 1017, 83 L.Ed.2d 1016 (1984), or federal judicial power
 
 
 [4]
 City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), is not to the contrary. In that case, the Court upheld Congress' use of its Fifteenth Amendment power to enact the Voting Rights Act which limited state sovereign control over voting. The Court observed that the Civil War Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." Id. at 179, 100 S.Ct. at 1563. However, the Court carefully avoided saying that Congress' power under these Amendments was "more plenary" than under Congress' Article I powers. The Court merely observed that, when Congress acts under other powers "principles of federalism ... might ... be an obstacle to congressional authority." Id. (emphasis added)
 
 
 [5]
 In that case Congress would have to provide that the cause of action could be brought in the state courts. Prior Supreme Court cases suggest that a state court is obligated to entertain suits seeking to enforce substantive rights created under federal law. See, e.g., Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). In at least one case the Court has held that a state may not avoid this obligation by claiming that its courts lack jurisdiction over state officials because of sovereign immunity. See General Oil v. Crain, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908). See generally Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan.L.Rev. 1033, 1093-99 (1983) (discussing the possibility, and the limitations, of resolving federal claims against states in state courts). However, requiring Congress to make bankruptcy suits against a state enforceable in state court would force Congress to discard its long-standing policy of vesting exclusive jurisdiction in bankruptcy cases in the federal courts
 
 
 [6]
 Although "[t]he governmental immunity doctrine has its origin in the English common law and was based on the premise that the King could do no wrong," Adams v. Harris County, 316 F.Supp. 938, 943 (S.D.Tex.1970), we have previously recognized that, in modern times, "[t]he purpose of sovereign immunity is to protect the public fisc ...," Parks v. Pavkovic, 753 F.2d 1397, 1407 (7th Cir.1985)
 
 
 [7]
 Actually Sec. 547 grants this power to a trustee. However, Sec. 522(h), 11 U.S.C. Sec. 522(h) (1982), gives a debtor in possession the same power as a trustee
 
 
 [8]
 These provisions provide that:
 (a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.
 (b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.
 11 U.S.C. Secs. 106(a), (b) (1982).
 
 
 [9]
 This difference is often conceptualized as the difference between state voluntary "waiver" of immunity and congressional "abrogation" or "forced waiver" of immunity