# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### WABASH R. CO. v. UNITED STATES.

### ELGIN, J. & E. RY. CO. v. SAME.

#### (Circuit Court of Appeals, Seventh Circuit. February 3, 1909.)

#### Nos. 1,461, 1,473.

**1. COMMERCE (§ 27*)—INTERSTATE COMMERCE—SAFETY APPLIANCE ACT.**

The amendment of March 2, 1903 (32 Stat. 943, c. 976 [U. S. Comp. St. Supp. 1907, p. 885]), to the safety appliance act applies to all cars and trains operated by a railroad carrier of interstate commerce over an interstate highway, irrespective of whether they are operated between points situated in the same state, or whether they are empty, or whether the traffic carried is intrastate traffic, and is constitutional.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

**2. RAILROADS (§ 229*)—INTERSTATE COMMERCE—SAFETY APPLIANCE ACT.**

A penal statute, or one in derogation of the common law, should not be hedged in to less than the legislative intent, if that is clearly revealed by the act as a whole. From the title, and from every part of the safety appliance acts, it is indisputable that the purpose was to promote the safety of interstate passengers and freight, and to protect the lives and limbs of railroad employés while engaged in the work of interstate transportation.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

**3. COMMERCE (§ 27*) — SAFETY APPLIANCE ACTS — CARS SUBJECT TO RESTRICTIONS.**

If a car is set apart for carrying intrastate traffic exclusively, but if it is not confined to intrastate trains on an intrastate line, the fact that while it is laden with intrastate traffic it is hauled in connection with interstate cars on an interstate line requires it to be equipped with automatic couplers and grab-irons, in compliance with the federal safety appliance acts.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*]

**4. EVIDENCE (§ 514*)—EXPERT EVIDENCE.**

An expert trainman may be asked, at the trial of a case under the safety appliance acts, as to the condition of a car coupler in question, and as

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

168 F.—1

to what was necessary in order to operate that coupler, as the mode of operation of automatic coupling mechanism and the effect of various conditions thereof are proper subjects for expert testimony.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2323; Dec. Dig. § 514.*]

(Syllabus by the Court.)

5. WORDS AND PHRASES—"USED."

The word "used," in Safety Appliance Act March 2, 1893, requiring common carriers to equip any car used in moving interstate traffic with automatic couplers, applies to all cars and trains operated by a railroad carrier of interstate commerce over an interstate highway, irrespective of whether they are operated between points situated in the same state, or whether they are empty, or whether the traffic carried is interstate traffic.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 8, pp. 7228–7237; vol. 8, p. 7825.]

In Error to the District Court of the United States for the Southern Division of the Southern District of Illinois.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

These cases arise under the safety appliance acts. The first, second, and fourth sections of Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), are as follows:

"Section 1. That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose.

"Sec. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Sec. 4. That from and after the first day of July, eighteen hundred and ninety-five, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab-irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

In the first section of Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), it was provided: "That the provisions and requirements of the act" of March 2, 1893, "shall apply in all cases, whether or not the couplers brought together are of the same kind, make, or type; and the provisions and requirements * * * relating to train brakes, automatic couplers, grab-irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, * * * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith."

In the Wabash case the only question is the sufficiency of the petition. The averments in substance were that the Wabash Company was an interstate common carrier, owning and operating an interstate railroad, and engaged in transporting thereover commodities in interstate traffic; that on a day named it hauled on its line of railroad a car that was not equipped with automatic couplers; that the car was one "regularly used in the movement of interstate traffic," but at the time in question was empty. As against the demurrer to

this petition it stands admitted that the defective car was not a part of an interstate train, was not itself being moved on an interstate journey, and was not exclusively devoted to the carriage of commodities in interstate traffic. Contentions are presented that the car was not within section 2 of the act of 1893, and that if, by reason of the declaratory and interpretative act of 1903, this car be held to be included, the legislation would be in excess of the powers of Congress to regulate commerce.

In the Elgin, Joliet & Eastern case, besides the same matter of pleading, the question is presented by the evidence "whether a car, merely in the same train with other cars that are carrying interstate commerce, is by the fact alone of being in such a train, within the provisions of the act." Some minor points are urged, the facts in relation to which are indicated in the opinion.

In Case No. 1,461:

N. S. Brown and McAnulty & Allen, for plaintiff in error.

William A. Northcott, U. S. Atty., Henry A. Converse, Asst. U. S. Atty., and Philip J. Doherty and Luther M. Walter, Sp. Asst. U. S. Attys.

In Case No. 1,473:

Kemper K. Knapp, R. W. Campbell, William Duff Haynie, and William Beye, for plaintiff in error.

Edwin W. Sims, U. S. Atty., Henry A. Parkin, Asst. U. S. Atty., and Philip J. Doherty and Luther M. Walter, Sp. Asst. U. S. Attys.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). Do the words in the second section of the act of 1893, "any car used in moving interstate traffic," mean that a car is subject to the statute only during the time it is actually employed in moving interstate traffic, or that every car is within the act if it is customarily or repeatedly employed in such movements? Both meanings are within the dictionary definitions of "used," and, if regard were paid only to the rule that a penal statute should be strictly construed, the narrower meaning might be taken. But a penal statute, or one in derogation of the common law, should not be hedged in to less than the legislative intent if that is clearly revealed by the act as a whole. From the title and from every part of the act we think it is indisputable that the purpose was to promote the safety of interstate passengers and freight and to protect the lives and limbs of railroad employés while engaged in the work of interstate transportation. The risks incurred in coupling and uncoupling are more imminent on switching tracks, where trains are made up and distributed, and where empty cars are set out at freight houses or factory platforms to be loaded, than on the main lines. It is not reasonable to suppose that Congress intended to cover only the smaller part of the dangers; and since the language employed is entirely consistent with the larger meaning, section 2 of the act of 1893 should be held to forbid an interstate carrier from hauling or using on its line any car that is customarily or generally employed in moving interstate traffic, and that is not equipped with automatic couplers, even though at the particular time the car be empty or be moving intrastate traffic.

This interpretation follows, we believe, from the decision in Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363.

A dining car that had been in regular service between San Francisco, Cal., and Ogden, Utah, was dropped by an east-bound train at Promontory, Utah, to be attached to the next west-bound train. While the car was standing empty on a siding, a freight brakeman was ordered to couple it to an engine for the purpose of turning it around preparatory to its being picked up by the west-bound train. The car was not equipped with automatic couplers. "Confessedly this dining car," the Supreme Court said, "was under the control of Congress while in the act of making its interstate journey, and in our judgment it was equally so when waiting for the train to be made up for the next trip. It was being regularly used in the movement of interstate traffic and so within the law."

The Elgin, Joliet & Eastern record involves the further inquiry: If a car is set apart for carrying intrastate traffic exclusively, but if it is not confined to intrastate trains on an intrastate line, does the fact that while it is laden with intrastate traffic it is hauled in connection with interstate cars on an interstate line require it to be equipped with automatic couplers and grab irons? While the usual canons of construction might not lead to holding such a car to be within sections 2 and 4 of the act of 1893, it seems to us beyond doubt that the rule of interpretation prescribed in section 1 of the act of 1903 forecloses the question. The provisions relating to automatic couplers, etc., "shall be held to apply" to all cars used on any railroad engaged in interstate commerce and to all other cars used in connection therewith.

But these interpretations, it is insisted, carry the legislation beyond the powers of Congress. The answer, in outline, is this: When the Declaration of Independence ripened into fact, the several states could have taken their separate places in the family of nations as absolutely sovereign powers, and the commerce among them would have been on the same footing as commerce "with foreign nations" and "with the Indian tribes." On abandoning their "firm league of friendship" and adopting the Constitution, the states divested themselves of the power to regulate interstate commerce as completely as they did of the power to regulate foreign commerce, and transferred to the nation in equal terms the power to regulate both. To the extent that there is a difference between the power of Congress over interstate commerce and over foreign commerce, it comes not from any difference in the grants, but from the fact that other provisions of the Constitution which may limit the exercise of the power over interstate commerce may have no application to foreign commerce. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999; Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; Champion v. Ames, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492; Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. But though the power conferred by the commerce clause is absolute, except as limited by other parts of the Constitution, yet, inasmuch as that instrument is one of "enumeration rather than of definition," the questions always remain in a given case: Is the subject-matter interstate commerce? Is the purported regulation in fact a regulation?

And is the regulation obnoxious to any of the restraining clauses of the Constitution?

In response to these questions no generalizations in advance of the long processes of judicial inclusion and exclusion should be attempted, and the particular answers should be understood as limited to the facts of the cases. That transportation is commerce and that those who do the business of carrying passengers and freight across state lines are engaged in interstate commerce are matters settled beyond question. State Freight Tax Case, 15 Wall. 232, 21 L. Ed. 146, and authorities supra. No restraining clauses are relied on by counsel to limit the face value of the commerce clause as applied to these cases. No doubt is suggested that the requirement of safety appliances on cars that are actually laden with interstate traffic is a regulation of interstate commerce. Now, if the same interstate carrier may haul on the same interstate highway cars that need not be equipped because though regularly used in interstate traffic they are empty at the time (the Wabash case) and also cars that need not be equipped because they are laden with intrastate traffic exclusively (the Elgin case), the purpose of equipping the cars that are carrying interstate traffic would manifestly be largely impaired or destroyed; for in switching movements, in derailments, and in collisions, disaster would come to the interstate car quite irrespective of the character of the other cars involved. Therefore Congress, under the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers" of regulating interstate commerce, had the right to make the laws in question; and they are paramount, of course, to all laws of the states. This result, which we deem sound in reason, is indirectly sustained; we believe, by the Employer's Liability Cases, supra; for there the statute was overthrown only because an inseparable part of it was found to have no necessary or proper relation to the security of interstate transportation.

In the Elgin case it is insisted that, although the car in question was not furnished with equipment by which it could be uncoupled from the adjacent car "without the necessity of men going between the ends of the cars," the act was not violated because the adjacent car was equipped so that it could be uncoupled from the car in question in the prescribed manner. Under the act each car is a unit and must itself be completely equipped so that trainmen may go about their work without charging their memories with differences between cars.

An expert trainman, after describing the broken condition of a coupler, was asked:

"In the condition in which that coupler was on that end of the car at that time, what was necessary in order to operate the coupler?"

He answered:

"It would necessitate a man going between the ends of the cars and taking the part of the chain that was left with the coupler to operate that coupler."

The question was objected to on the ground that it called for a conclusion and invaded the province of the jury. In our judgment the mode of operation of automatic coupling mechanism and the effect of various conditions thereof were proper subjects for expert testimony.

By an oral stipulation in open court the Elgin Company admitted that "it is a common carrier engaged in interstate commerce." Under the assignment that the court erred in refusing to direct a verdict for defendant, contention is now made that there was no evidence to show that defendant was an interstate carrier at the times laid in the petition. That was not disclosed as one of the grounds of the motion. If it had been, defendant would have been compelled to amend the stipulation, or plaintiff would have introduced the evidence, to obviate the taking of which the stipulation had been made. As the point was not presented to and ruled on by the trial court, it is not available here.

The judgment in each case is affirmed.

GROSSCUP, Circuit Judge (concurring). I feel that in view of the far reach that this decision gives to the commerce clause of the Constitution, and the fact that our judgment is not unanimous, I should indicate the line of thought that has led me (overcoming as I went along a good deal of doubt) to the conclusion arrived at.

The declaration alleges that plaintiff in error is a common carrier engaged in interstate commerce; that on the date named, it hauled on its line of railroad a car regularly used in the movement of interstate commerce, but, at the time, empty; that the car was being hauled from a point in the state of Illinois "in an easterly direction" (whether destined to some point in the state of Illinois is not stated); and that the line of railroad over which it was being hauled is a part of a through highway, over which interstate traffic is being continually hauled, from one state in the United States to another state in the United States.

Assuming that every averment of the declaration is true, it appears (the pleading to be taken most strongly against the pleader) that the car involved in this suit may, on this date, and on this trip, have been hauled alone, or one of a train made up to start, run, and stop, wholly within the state of Illinois; actually starting, running, and stopping wholly within the state of Illinois; and carrying traffic wholly originating in the state of Illinois, and whose destination was at points wholly in the state of Illinois—neither the car, nor its contents, nor any part of the train of which the car was a part, nor any part of the train's contents being either in purpose, operation, or traffic actually carried, a train in interstate commerce, except as it may be such by reason of the fact that it was moving over rails that were part of a line of railroad that is an interstate highway, and was operated by a carrier that, in addition to the operation of this train, was engaged in operating trains in interstate commerce. That a car or train thus starting, running, and stopping wholly within a single state, and not intended to run beyond the state, and carrying traffic originating wholly within the state, and destined to points wholly within the state, is not, for the time being, actually "engaged" in interstate commerce, is a proposition that does not need argument. That the traffic, thus carried from a point wholly within the state to another point wholly within the state, is not interstate commerce, is a proposition, also, that does not need argument.

But does it follow, that because, considered by itself, a given train or car is not for the time being actually "engaged" in interstate commerce, or that the contents are not interstate commerce, that the "railroad," as an entirety, is not a highway of interstate commerce, or the operation of its trains, as an entirety, including the operation of such trains or cars, is not within the purview of the power given Congress? We are now dealing with subject-matter of government. May not specific trains and cars, and their contents, considered by themselves, fall within a subject-matter of government essentially different from the operation of the railroad as an entirety, in which every locomotive, train, and car are so correlated that the operation of each is but a correlative part of the operation of the whole? And does not the existence of this distinction bring the operation of such car or train, irrespective of their status as mere vehicles of the commerce with which for the time being they are loaded, within the railroad's operations that, as an entirety, are operations in interstate commerce, and, therefore, within the power of Congress to regulate? These are the precise questions that this case presents.

The first, second, and fourth sections of the act of March 2, 1893 (I requote them), are as follows:

"Section 1. That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose.

"Sec. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Sec. 4. That from and after the first day of July, eighteen hundred and ninety-five, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab-irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

In the first section of Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), it was provided:

"That the provisions and requirements of the act (that of March 2, 1893) shall apply in all cases, whether or not the couplers brought together are of the same kind, make, or type; and the provisions and requirements * * * relating to train brakes, automatic couplers, grab-irons, and the height of draw bars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce. * * * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith."

The act of March 2, 1893, standing by itself, need not be interpreted to include the purely intrastate car or train described. There is nothing in the language of that act that necessarily includes such an intrastate car or train. The words "any car used in moving interstate

traffic" may very reasonably be interpreted to mean any car used, at the time complained of, in the moving of interstate traffic, or in connection with the movement of interstate traffic. So far as the act of March 2, 1893 goes, the constitutional power of Congress to regulate a purely intrastate train, carrying purely intrastate traffic, but moving on rails that are a part of an interstate line, and by a carrier that in addition operates interstate trains, is not necessarily raised.

But coming to the act of March 2, 1903, we find that the provisions of the preceding act relating to train brakes, automatic couplers, and the like, are declared "to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce * * * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith"—language that leaves no reasonable alternative to holding, that no matter how entirely intrastate the movement of the car, or the train to which the car is attached, may be, and how entirely intrastate the traffic carried may be, the hauling of the car or train thus unequipped is within the act, provided the "railroad" on which the car or train is used is one engaged in interstate commerce. Is such regulation within the constitutional powers of Congress?

The General Government, within its constitutional field of power, is a government that is just as direct, plenary, and domestic as the several governments of the states; and the several governments of the states, outside the field of constitutional power bestowed on the Government of the United States, are just as plenary as the Government of the United States; so that, generally speaking, within its powers to regulate, every person and corporation, including common carriers, are answerable to the regulation of the Government of the United States, and exempt from being answerable to the regulation of the governments of the states; and within their power to regulate, every person and corporation, including common carriers, are answerable to the regulation of the state governments, and equally exempt from being answerable to the regulation of the General Government.

But such is not always the case; for although the division of power between the General Government and the states is the division of subject-matter of government, and the line to be drawn, in any case presenting an inquiry respecting power, is the line between such divisible subject-matter, there are subject-matters of government that at one and the same time directly affect, and are directly connected with, other subject-matter lying on both sides of the line. And it is just here that the difficulty of running the line arises. Just such a case is the one before us.

Interstate commerce, in its broadest sense, is commercial intercourse between the states; the obverse of which would seem to be, that commercial intercourse that is wholly within the state is not interstate commerce. The railway locomotive, train, or car, or the car as a constituent of the train, that goes from state to state carrying wholly, or in part, any interstate commerce, are for the time being instrumentalities of interstate commerce; as also the locomotive, train, or car that, though not going out of the state, carries on its way through the state traffic that is in interstate transit; and the

obverse of that would seem to be that a train traveling wholly between points in the same state, and not going out of the state, and carrying wholly commerce originating in the state, destined to points in the same state, is not for the time being an instrument of interstate commerce. But may not the operation of such a purely intrastate train (an instrumentality solely of intrastate commerce when considered by itself) be so bound up with the operation of interstate trains or instrumentalities of interstate commerce—may not the connection between them be so direct and so inseparable—that in substance their operation is one and the same thing—but a part only of that which constitutes, in its entirety, the operation of the whole railroad, including all its trains, and necessarily, therefore, the subject-matter of one and the same source of regulation. Certainly on railroads over which interstate trains are operated there are some matters (such as what signal lights cars and trains shall carry; what kind of examination respecting eyesight employés dependent on these lights shall be subject to; whether air brakes shall be employed, and to what extent; the character of switches, the character of rails, the character and operation of interlocking devices, at railway crossings) that though local, constitute subject-matter so directly connected with the operation of all trains, irrespective of whether they are intrastate or interstate—are so connected with the operation of the railroad as an entirety—that they may be well held to constitute but a single subject-matter of governmental regulation. And in such cases, where the regulation cannot go to both state and General Government, it goes of course, whenever the General Government acts, to the General Government.

Now it seems to me that in the matter of safety appliances, in the very nature of the case, the operation of trains by a railroad engaged in interstate commerce, irrespective of whether the trains are intrastate or interstate trains (that is to say, the operation of the railroad as an entirety), leads to the same view, and for the same practical reasons. Primarily, these safety-appliance acts are to safeguard railway employés—the car not being the unit, but the train of which the car is a constituent—and in carrying out this primary object, the necessity of regulation extends to every car to be operated, not only those to be operated from state to state, but those to be operated wholly within a given state. Indeed, one of the chief dangers that regulation is intended to safeguard against is that incurred in the making up and the unmaking of trains in the switch yards—the putting together of the constituents into a unit, and their subsequent dissolution—in the process of which all distinction between trains and cars that have been, or are to be, used in interstate commerce or intrastate commerce, is obliterated, thereby subjecting the employés of trains that have come from, or are going into interstate commerce, to all the dangers that lurk in all the cars used on the road, in both interstate and intrastate operation. Besides, trains that are purely intrastate, unregulated in the matter of automatic couplings, may be a menace to persons and property carried by interstate trains—differing in that respect only in degree from the menace of trains

unequipped with air or other power brakes—a view that seems to bring the subject-matter of regulation respecting automatic couplings within the power of the General Government; for power "to regulate" being unquestioned, the boundaries of that power are not determined by the degree of the need of regulation, but by the question whether there be a need that is a substantial one.

This view I think to be right, not only upon the practical considerations stated, but is the only view consistent with the cases already decided. True, the clearest cases relate to the power of Congress to make regulations, both for the safety of the public and of employés, upon the highways by water—regulations that apply not only to vessels navigating between different states, but to vessels navigating between points in the same state, provided the waterway is an interstate highway, including regulations analogous to the regulations here under review. The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999; Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. But as said by Mr. Justice Brewer, in Re Debs, 158 U. S. 590, 15 Sup. Ct. 908, 39 L. Ed. 1092, "the basis upon which rests its (the General Government's) jurisdiction over artificial highways is the same as that which supports it over the natural highways. Both spring from the power to regulate commerce." And in the regulation both of artificial and of natural highways, the measure of the General Government's power is the substantial need of interstate commerce; for we can not conceive that on one of the chief considerations that led to the formation of the General Government, the power to regulate was meant to be anything less than the full power that the need of the thing to be regulated might require.

SEAMAN, Circuit Judge (dissenting in No. 1,461; concurring in No. 1,473). The judgment against the Wabash Railroad Company can be upheld only on this proposition: Although the foreign car in question was moved on its line of railroad within the state of Illinois, for a movement commencing and ending in such state, in no sense connected with interstate traffic or with the operation of a train therein, it is nevertheless subject to the penal provisions of the safety appliance acts for moving such car, because (a) the company engages as well in interstate commerce over such line, and (b) the foreign car so moved is one "regularly used in the movement of interstate traffic." Laying out of view the want of an averment charging notice to the company of such prior service of this car, I am of opinion that the provision so interpreted exceeds the power vested in the general government under the Constitution. It is well and rightly settled, in conformity with one of the fundamental objects sought in the permanent union of states and people as a nation, that the commerce clause granted supreme national power to regulate and control interstate commerce and all instrumentalities engaged therein while so employed. All legislative powers, however, were theretofore inherent in the state; and with the adoption of the Constitution the powers surrendered to the general government were such only as that instrument conferred upon it—either expressly granted or necessarily im-

plied in the terms—while the great residuum of legislative authority remained unimpaired in the state. This grant of national authority over interstate commerce was not exercised by the Congress over the great field of traffic by railroads for many years, and each state was thus left free to legislate for all regulation thereof within its borders. With the extension of railroads and interstate traffic throughout the country, however, national control became needful and congressional enactments have well attained that object. In so far as such legislation deals with that subject-matter, as above stated, it becomes paramount, and I believe state enactments are without force for interference, directly or indirectly, with subject-matter included therein; but regulation of intrastate traffic and movements, not connected with an operation which is of the interstate class, remains entirely within the state power and control. No clash of authority can arise when these jurisdictional boundaries are strictly observed by nation and state.

The Wabash Company, operating its lines for both classes of traffic—in the one instance an interstate movement and the other exclusively intrastate—must be governed by one or the other authority according to the nature of the operation. Its duality of obligation is not conflicting, but separable. For the movement of a car for a purpose of intrastate traffic alone, it must observe the state requirements—which include those at common law—and when the car is moved for a purpose of interstate traffic, the operation becomes subject to congressional regulation. While the carrier and all instrumentalities of commerce are subject to such regulation for all operations involved in interstate traffic, neither the carrier nor the car in question, is subject per se to regulation otherwise by Congress. I cannot concur in the view that a railroad, built and operated exclusively under the authority of the state, becomes a national highway when it crosses the state boundary under like authority, in the sense of complete national control over its operations as well in traffic not passing such boundary.

I am constrained, therefore, to dissent from affirmance of the judgment against the plaintiff in error, Wabash Company.

In reference to the safety appliance acts, I am impressed with no doubt of the validity of these enactments, exclusive of the amendment of 1903, when interpreted in conformity with the foregoing view, as their terms authorize and the opinion of this court concedes to be within their literal definition. I believe the amendment of 1903 furnishes the only ground for the contention of liability, and that so interpreted the amendatory provision is unconstitutional.

The judgment against the Elgin, Joliet & Eastern Railway Company is not within the above-stated objections, and I concur in the conclusion for affirmance thereof.