**SEMINOLE TRIBE OF FLORIDA,**
**Plaintiff,**

v.

**STATE OF FLORIDA, Lawton Chiles,**
**Governor of the State of Florida,**
**Defendants.**

**No. 91–6756–CIV.**

United States District Court,
S.D. Florida.

June 18, 1992.

Bruce S. Rogow, Ft. Lauderdale, Fla., for plaintiff.

Jonathan A. Glogau, Asst. Atty. Gen., Tallahassee, Fla., for defendants.

## ORDER

MARCUS, District Judge.

THIS CAUSE is before the Court on Defendants' Motion to Dismiss on Eleventh Amendment Grounds, filed December 16, 1991. For the following reasons, the motion is Denied.

## I. BACKGROUND

Plaintiff, the Seminole Tribe of Florida (the "Tribe") is a federally recognized Indian tribe whose headquarters are located in Broward County, Florida. The Tribe commenced this action pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), to remediate the alleged failure of the State of Florida to conduct good faith negotiations regarding certain gaming activities to be conducted on the Tribe's land, after State–Tribe compact ne-

gotiations failed to yield an agreement. According to the Tribe, "the State and its Governor have refused to enter into any negotiation for inclusion of such gaming in a tribal-state compact, [and have according-ly] violated [IGRA's] requirement of good faith negotiation." Compl. at ¶ 24. The Defendants assert that they have in fact entered into good faith negotiations with the Tribe, but maintain that those negotiations were unavailing since the gaming activities at issue are prohibited under Florida law. In addition, the Defendants have moved to dismiss the action pursuant to the Eleventh Amendment to the United States Constitution, arguing that Congress does not have the power constitutionally to enforce the "good faith" requirement of the compact process by explicitly providing the Tribe a judicial remedy against the State.

## II. LEGAL FRAMEWORK

### A. *Indian Gaming Regulatory Act*

The Indian Gaming Regulatory Act was enacted by Congress primarily "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments...." 25 U.S.C. § 2702(1). IGRA divides Indian gaming into three distinct classes. Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.* at § 2703(6). "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes" and is not subject to the provisions of IGRA. *Id.* at § 2710(a)(1). Class II gaming includes bingo, pull-tabs, lotto, punch boards, tip jars and other similar games, *id.* at § 2703(7)(A)(i), and certain non-banking card games (not including blackjack and baccarat), *id.* at §§ 2703(7)(A)(ii); 2703(7)(B)(i). "Class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes," but is subject to the provisions of IGRA, *id.* at § 2710(a)(2), including oversight by National Indian Gaming Commission, es-

tablished within the Department of the Interior. *Id.* at § 2704(a).

Class III gaming is "all other forms of gaming that are not class I gaming or class II gaming." *Id.* at § 2703(8). "Class III gaming activities shall be lawful on Indian lands only if such activities are ... located in a State that permits such gaming for any purpose by any person, organization, or entity...." *Id.* at § 2710(d)(1). IGRA further provides that

[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, *shall* request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities. Upon receiving such a request, *the State shall negotiate with the Indian tribe in good faith to enter into such a compact.*

*Id.* at § 2710(d)(3)(A) (emphasis added). Finally, IGRA mandates that

[t]he United States district courts shall have jurisdiction over ... any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact under paragraph (3) or to conduct such negotiations in good faith....

*Id.* at § 2710(d)(7)(A)(i). Notwithstanding the express terms of Section 2710, Defendants argue that any such suits brought to remediate a State's alleged failure to negotiate in good faith are barred by the Eleventh Amendment.

## B. *Eleventh Amendment*

The Eleventh Amendment to the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States

by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. amend. XI. The scope of the Amendment has been extended beyond the literal text to also bar suits against a State brought by one of its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Thus, as the United States Supreme Court has recently observed:

Despite the narrowness of its terms, since *Hans v. Louisiana* we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; [and] that the judicial authority in Article III is limited by this sovereignty....

*Blatchford v. Native Village of Noatak*, — U.S. —, —, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991) (citation omitted). Three exceptions to the Amendment exist: (1) a State may consent to suit in federal court, or waive its immunity to such suits, either expressly or impliedly; *see id.*; (2) Congress may, when it possesses the power, abrogate the States' immunity; *see Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 13–23, 109 S.Ct. 2273, 2280–86, 105 L.Ed.2d 1 (1989); and (3) state officials may under certain circumstances be sued, in their official capacities, to obtain prospective relief. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Against this framework, we proceed to evaluate Defendant's Motion to Dismiss.

## III. ANALYSIS

### A. *Abrogation*

The Tribe's central argument in opposition to the Motion to Dismiss is that Congress, in enacting IGRA, abrogated the State's Eleventh Amendment immunity.[1] We hold that Congress did in fact abrogate

---

1. The Tribe also argues that the State has implicitly waived its immunity, either inherently in the "plan of convention", *see Blatchford,* — U.S. at —, 111 S.Ct. at 2581, or constructively by the State's acceptance of the benefits of IGRA, *see Parden v. Terminal Railway,* 377 U.S. 184, 192–93, 84 S.Ct. 1207, 1212–13, 12 L.Ed.2d

233 (1964). Since the Tribe has not strenuously pursued either "waiver" theory, and since we reach our decision on purely "abrogation" principles, we need not address the issues raised by these arguments except insofar as they may bear upon Congress' power to abrogate.

the States' immunity when it enacted IGRA, and, despite case authority to the contrary,[2] further hold that, pursuant to the Indian Commerce Clause, Congress plainly had the constitutional power to abrogate.[3]

### 1. Statutory Language

■ At the outset, the United States Supreme Court has held that

Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.

*See Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, ——, 87 L.Ed.2d 171 (1985); *see also Blatchford,* —— U.S. at ——, 111 S.Ct. at 2584; *Dellmuth v. Muth,* 491 U.S. 223, 226, 109 S.Ct. 2397, 2399, 105 L.Ed.2d 181 (1989). In the instant case, the relevant portion of IGRA provides:

The United States district courts shall have jurisdiction over ... any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact under paragraph (3) or to conduct such negotiations in good faith....

25 U.S.C. § 2710(d)(7)(A)(i). It is beyond peradventure that, in expressly providing for federal jurisdiction over claims brought by Indian tribes against States to compel good faith negotiations under IGRA (or to remedy the lack of such negotiations), Congress made its intention to abrogate the States' immunity in this context "unmistakably clear in the language of the statute." *See Atascadero,* 473 U.S. at 242, 105 S.Ct. at 3147. Indeed, the State of Florida concedes as much. *See* Def.Mem. at 14 ("There is little doubt but that IGRA's attempted abrogation of state immunity is

clear enough to do so if Congress has the power to abrogate in this situation."). Moreover, every court to squarely consider this precise issue has concluded that the language in Section 2710 is "unmistakably clear." *See Sault Ste. Marie Tribe of Chippewa Indians, et al. v. State of Michigan,* No. 90–611, 1992 WL 71384, at *4 (W.D.Mich. Mar. 27, 1992) ("IGRA demonstrates specific Congressional intent that *states* be subject to suit in federal courts based upon violations of IGRA. This Court finds that the Act is a clear statement of waiver of sovereign immunity." (emphasis in original)); *Poarch Band of Creek Indians v. State of Alabama,* 776 F.Supp. 550, 557 (S.D.Ala.1991) ("[T]his Court has little doubt but that IGRA's attempted abrogation of state immunity is clear enough to do so if Congress has the power to abrogate in this situation.... It is difficult to imagine a clearer statement of Congress' intent to subject states to lawsuits in the federal courts."). Accordingly, we find that IGRA, on its face, abrogates the States' Eleventh Amendment immunity. That does not end the inquiry, however.

### 2. Congressional Power to Abrogate

■ A more difficult question is whether, notwithstanding its manifest intent to do so, Congress had the power to abrogate the States' immunity in the context at issue here. Given Congress' plenary authority over Indian relations, explicitly noted in the text of the Constitution at Article I, § 8, cl. 3, and the uniquely federal issues raised when such authority is exercised, considered in conjunction with the principles enunciated by the Supreme Court in *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), we conclude that Congress, when acting pursuant to the Indian Commerce Clause, has the power to abrogate the States' immunity.

---

**2.** *See Sault Ste. Marie Tribe of Chippewa Indians, et al. v. State of Michigan,* No. 90–611, 1992 WL 71384, at *4–5 (W.D.Mich. Mar. 27, 1992); *Spokane Tribe of Indians v. State of Washington,* 790 F.Supp. 1057, 1059–61 (E.D.Wash.1991); *Poarch Band of Creek Indians v. State of Alabama,* 776 F.Supp. 550, 557 (S.D.Ala.1991).

**3.** Both the Indian and Interstate Commerce Clauses are found in the same delegation of legislative authority, which gives Congress the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3.

We begin by observing that the Indian Commerce Clause of the Constitution provides that "Congress shall have power ... To regulate Commerce ... with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Congressional power over Indian affairs is plenary. *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1715–16, 104 L.Ed.2d 209 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs...."); *Oneida County, N.Y. v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 234–35, 105 S.Ct. 1245, 1251–52, 84 L.Ed.2d 169 (1985) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law." (citing The Federalist No. 42)); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) ("Congress has broad power to regulate tribal affairs under the Indian Commerce Clause...."); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians, et al., v. Voigt,* 700 F.2d 341, 361 (7th Cir.) ("Congress has plenary authority over Indian affairs. This power is rooted in ... the Indian commerce clause...." (citation omitted)), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1973); *Agua Caliente Band of Mission Indians v. County of Riverside,* 306 F.Supp. 279, 282 (C.D.Cal.1969) ("The nature of Congressional power in Indian matters is paramount and plenary."), *aff'd,* 442 F.2d 1184 (9th Cir.1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972).

■ In *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), Chief Justice Marshall, writing for the High Court, observed that

[the Articles of Confederation] gave the United States in congress assembled the sole and exclusive right of "regulating the trade and managing all the affairs with the Indians, not members of any of the states; provided, that the legislative

power of any state within its own limits be not infringed or violated."

\* \* \* \* \* \*

The correct exposition of this [section of the Articles of Confederation] is rendered unnecessary by the adoption of our existing constitution. That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restriction on their free actions; the shackles imposed on this power, in the [Articles of Confederation], are discarded.

31 U.S. at 558–59. *See also United States v. City of Salamanca,* 27 F.Supp. 541, 543 (W.D.N.Y.1939) ("Any doubt as to whether under the Articles of Confederation certain rights over the Indians were reserved to the states was removed by the adoption of the Constitution."); The Federalist No. 42, at 268 (James Madison) (Clinton Rossiter ed., 1961) ("The regulation of commerce with the Indian tribes is very properly unfettered from two limitations in the Articles of Confederation...."). And in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), a unanimous Supreme Court opined:

Resolution of the instant issue [of whether an Indian employment preference violates the Due Process Clause of the Fifth Amendment] turns on the unique federal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a "guardian-ward" status, to legislate on behalf of federally recognized Indian tribes. The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself.

417 U.S. at 551–52, 94 S.Ct. at 2483.[4] It is thus abundantly clear that issues pertain-

4. Still other courts, and a number of commentators, have acknowledged the uniquely federal nature of Indian relations, and the breadth of congressional power in that area. *See McClana-*

ing to Indian affairs are uniquely federal, and that in regulating such affairs *vis-a-vis* the States, congressional authority is plenary.

Moreover, it has repeatedly been observed that Congress may abrogate the States' immunity when it acts pursuant to a plenary grant of authority plainly embodied in the textual framework of the Constitution. *See, e.g., Pennsylvania v. Union Gas Co.,* 491 U.S. at 15, 109 S.Ct. at 2281–82; *Hutto v. Finney,* 437 U.S. 678, 693–94, 98 S.Ct. 2565, 2574–75, 57 L.Ed.2d 522 (1978); *Richard Anderson Photography v. Brown,* 852 F.2d 114, 123–24 (4th Cir.1988) (Boyle, J., concurring in part and dissenting in part), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989); *United States v. Union Gas Co.,* 832 F.2d 1343, 1356 (3d Cir.1987), *aff'd,* 491 U.S. 1 (1989); *Matter of McVey Trucking, Inc.,* 812 F.2d 311, 323 (7th Cir.), *cert. denied,* 484 U.S. 895, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987); *Malone v. Schenk,* 638 F.Supp. 423, 426 (C.D.Ill.1985).[5] Congress' paramount and plenary authority over Indian affairs is therefore a substantial basis upon which to find congressional power to abrogate when legislating pursuant to that authority.

▪ We next turn to a consideration of *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). In *Union Gas,* the Supreme Court held that the plain language of the Comprehensive Environmental Response, Compensation,

and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* permits a suit for monetary damages against a state in federal court. 491 U.S. at 5, 109 S.Ct. at 2276. Further, a majority of the Court concluded that Congress has the power to abrogate the States' immunity when legislating pursuant to the Interstate Commerce Clause. *Id.* at 13–23, 57, 109 S.Ct. at 2280–86, 2295. Justice Brennan authored the plurality opinion of the Court on the abrogation issue, in which Justices Marshall, Blackmun, and Stevens joined. Justice White filed a separate opinion in which he concurred in the judgment and noted his agreement "that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States...." 491 U.S. at 57, 109 S.Ct. at 2295. Justice Brennan's plurality opinion reasoned that Congress possessed such power principally by virtue of "the plenary powers granted it by the Constitution" to regulate interstate commerce, *id.* at 14–19, 109 S.Ct. at 2281–84 (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614 (1976) (holding that Congress may abrogate States' immunity when legislating under § 5 of the Fourteenth Amendment, since its powers under that amendment are plenary)), and also, to a lesser extent, by virtue of the States' surrender of immunity in the "plan of convention" regarding matters within the ambit of the Interstate Commerce Clause.[6] *Id.,* 491 U.S. at 19–23,

***

*han v. State Tax Comm'n of Arizona,* 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973) ("'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.'" (quoting *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945))); *James v. Watt,* 716 F.2d 71, 73–77 (1st Cir.1983) (undertaking analysis of dormant effect of Indian Commerce Clause), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *see also* Williams, *The Borders of the Equal Protection Clause: Indians as Peoples,* 38 U.C.L.A.L.Rev. 759 (1991) (acknowledging that "the grant of power to Congress over the Indians may be 'plenary' ... in the sense that its power over interstate commerce is plenary," but arguing that both are equally restricted by the equal protection element of the Fifth Amendment); Ainsworth, *The Negative Foreign Commerce Clause: An Analysis of the Reserved Unitary Tax Issue in* Container Corporation of America v. California Franchise Tax Board, 8

B.U.J.Tax L. 65 (1990) ("it is Congress, not the states, which must fairly regulate commerce 'with the Indian tribes'").

5. We note that, in the Bankruptcy Clause context, the United States Court of Appeals for the Eleventh Circuit has expressly left open the question of congressional power to abrogate. *TEW v. Arizona State Retirement System,* 873 F.2d 1400, 1401 (11th Cir.1989) (per curiam) ("Because we hold that Congress has not expressly abrogated sovereign immunity here, we do not reach the constitutional question of whether it would have the authority to do so." (citation omitted)).

6. Defendants argue that the applicability of *Union Gas* to the instant case is undermined by the Tribe's inability to satisfy the "plan of convention" prong of that decision since no State–Tribe "mutuality" was represented in the "plan of con-

109 S.Ct. at 2284–86. Since Congress clearly possesses complete and plenary authority in the area of Indian affairs, which is at least as broad as Congress' interstate commerce power, *see* note 8, *infra,* we hold that Congress has the power to abrogate the States' immunity pursuant to the Indian Commerce Clause.

Defendants have rested their Eleventh Amendment argument on three recent district court opinions, *Sault Ste. Marie Tribe of Chippewa Indians, et al. v. State of Michigan,* No. 90–611, 1992 WL 71384 (W.D.Mich.1992); *Spokane Tribe of Indians v. State of Washington,* 790 F.Supp. 1057 (E.D.Wash.1991); and *Poarch Band of Creek Indians v. State of Alabama,* 776 F.Supp. 550 (S.D.Ala.1991). First, Defendants observe that the district courts in both the *Sault Ste. Marie* and the *Poarch* cases expressed misgivings as to the continuing vitality of *Union Gas,* with the court in *Poarch* going so far·as to conclude that,

> [b]ecause *Union Gas* is not directly on point, and with an eye toward the shaky ground on which it stands, this Court does not find the decision to be controlling. The weakness of the plurality opinion leads this Court to believe that it

vention." We cannot agree. The plurality's "plan of convention" discussion in *Union Gas* is, in our view, more a natural extension of the "plenary power" basis of the decision than a separate requirement of mutuality, since, even when discussing the "plan of convention," the Court was primarily concerned with Congress' plenary powers in the area of interstate commerce, observing:

> It would be difficult to overstate the breadth and depth of the commerce power. It is not the vastness of this power, however, that is so important here: it is its effect on the power of the States.

491 U.S. at 20, 109 S.Ct. at 2284. (citations omitted). This is precisely the same observation advanced by the Court when analyzing Congress' plenary power in this area:

> [T]he Commerce Clause with one hand gives power to Congress while, with the other, it takes power away from the States.... The important point ... is that the provision both expands federal power and contracts state power; that is the meaning, in fact, of a "plenary" grant of authority....

*Id.* at 16–17, 109 S.Ct. at 2282–83.

We thus rest today's decision primarily on Congress' plenary power over Indian affairs,

should not be given an expansive application. . . .

776 F.Supp. at 558.[7] We are unpersuaded. As already noted, a majority of the Supreme Court in *Union Gas* held that Congress had the power to abrogate the States' immunity under the Interstate Commerce Clause; *Union Gas* is binding authority on this Court. It is a mistake to simply dismiss *Union Gas* as being inapposite, especially since congressional power over both interstate and Indian commerce derives from precisely the same Constitutional clause, Article I, § 8, cl. 3, and since its power in both areas is plenary. *See Matter of McVey Trucking,* 812 F.2d at 323 (holding that "Congress may abrogate state immunity to suit pursuant to any of its plenary powers," including the Bankruptcy Clause of Article I, § 8, cl. 4); *Peel v. Florida Dep't of Transp.,* 600 F.2d 1070, 1080 (5th Cir.1979) (finding authority to abrogate pursuant to Congress' war powers, and observing that "nothing in the history of the eleventh amendment, the doctrine of sovereign immunity, or the case law indicates that Congress, when acting under an [A]rticle I, section 8 delegated power, lacks the authority to provide for

rather than on a "mutuality in the plan of convention" theory, for a number of reasons. First, an explication of plenary congressional power is, in our view, the central thrust of *Union Gas,* and is a proper basis on which to find congressional power to abrogate. In addition, the latter theory seemingly begs the question by presuming that the states have already ceded their sovereignty. Finally, we think, "plan of convention" cession is more properly a "waiver" argument than an "abrogation" argument, and, in the Indian affairs context, was rejected in *Blatchford,* — U.S. at —–——, 111 S.Ct. at 2581–83.

**7.** *See also Sault Ste. Marie,* 1992 WL 71384, at *5 (district court settles on a "narrow reading of *Union Gas*"); *Mississippi Band of Choctaw Indians v. State of Mississippi,* No. 90–386, 1991 WL 255614, at *6 (S.D.Miss. Apr. 9, 1991) ("[T]he Court notes that it does not consider the *Union Gas* decision itself controlling precedent upon which the eleventh amendment questions at issue here could be decided. *Union Gas* dealt with congressional abrogation of state immunity through an exercise of authority under the interstate commerce clause. The instant matter involves the Indian commerce clause.").

federal court enforcement of private damage actions against the states"); *BV Engineering v. University of Cal., Los Angeles,* 657 F.Supp. 1246, 1248 (C.D.Cal.1987) (finding congressional power to abrogate pursuant to Article I, § 8, cl. 8 (copyright powers), and observing that "Congress 'may abrogate state immunity to suit pursuant to any of its plenary powers'" (quoting *Matter of McVey Trucking,* 812 F.2d at 315–23)), *aff'd,* 858 F.2d 1394 (9th Cir.1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989).

█ The Defendants also attempt to draw important distinctions between the Interstate and Indian Commerce Clauses, citing principally to *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1715–16, 104 L.Ed.2d 209 (1989), where the Supreme Court observed that "[i]t is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications." Indeed, the courts in both *Spokane Tribe of Indians v. State of Washington,* 790 F.Supp. at 1059–61, and *Poarch,* 776 F.Supp. at 559, concluded from this language that it would be inappropriate to apply theories based on one clause to the other. Again, we do not find the argument persuasive. As we noted above, congressional power over both interstate and Indian commerce derives from the same clause

in the Constitution; and we are hard pressed to conclude that the congressional authority to abrogate the States' immunity in the area of interstate commerce is greater than in Indian commerce. Indeed, Defendants here acknowledged as much at oral argument:

THE COURT: Let me ask you a question. Is congressional authority under Article I, Section 8, dealing with the power to regulate commerce with the Indian tribes any less sweeping than the power to regulate commerce with foreign nations and among the several States?

MR. GLOGAU: No, it is not.

Transcr. of Hrng. of Jan. 13, 1992, at 10. Defendants nonetheless argue that Congress' power over Indian commerce is of a "very different specie" than the power over interstate commerce, and that *Union Gas* is therefore readily distinguishable, since the Indian commerce power lacks an element of "mutuality" found in the area of interstate commerce. *See id.* 491 U.S. at 10–16, 109 S.Ct. at 2278–82. This argument is unconvincing, and we conclude that, based on its paramount and plenary authority over Indian affairs, Congress' power to act pursuant to the Indian Commerce Clause is at least as great, if not greater, than its powers under the Interstate Commerce Clause.[8] Moreover, *Cot-*

---

8. *Accord Howard v. Illinois Central R. Co.,* 207 U.S. 463, 521, 28 S.Ct. 141, 154–55, 52 L.Ed. 297 (1908) (Moody, J., dissenting) ("There is nothing in the words of the grant [of commerce power to Congress] that permits the belief that the power is not coextensive over foreign, interstate, and Indian trade, or is anything less than the whole power which any government may properly exercise over either. . . ."); *Wabash R. Co. v. United States,* 168 F. 1, 4 (7th Cir.1909) ("When the Declaration of Independence ripened into fact, the several states could have taken their separate places in the family of nations as absolutely sovereign powers, and the commerce among them would have been on the same footing as commerce "with foreign nations" and "with Indian tribes." On abandoning their "firm league of friendship" and adopting the Constitution, the states divested themselves of the power to regulate interstate commerce as completely as they did of the power to regulate foreign commerce, and transferred to the nation in equal terms the power to regulate both. To the extent that there is a difference between the power of Congress over interstate commerce

and over foreign commerce, it comes not from any difference in the grants, but from the fact that other provisions of the Constitution which may limit the exercise of power over interstate commerce may have no application to foreign commerce."); Ainsworth, *supra* note 4 ("First, Indian Commerce Clause analysis is structured differently than Interstate Commerce Clause analysis. It proposes a tripartite balancing of unequal interests (tribal, state, and federal) rather than a binary balancing of constitutionally equal interests (two similarly situated taxpayers in the same or different states). Second, under the Indian Commerce Clause, there is a presumption against state authority to tax Indian-value without express Congressional approval; whereas under the Interstate Commerce Clause, there is a presumption in favor of any non-discriminatory state taxing scheme which has not been expressly disapproved of by Congress. Finally, under the Indian Commerce Clause, it is the quantitative weight of the burden imposed on Indian Commerce that is the significant question; whereas under the Inter-

*ton Petroleum* does not undercut this conclusion, since that decision goes on to note:

> In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, *the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.*

490 U.S. at 192, 109 S.Ct. at 1715–16 (emphasis added).[9]

■ Finally, Defendants rely on *Blatchford* in concluding that Congress lacked the power to abrogate.[10] This reliance is misplaced, we think, since *Blatchford* is primarily a "waiver" case, and its concerns over a lack of "mutuality of ... concession," —— U.S. at —— – ——, 111 S.Ct. at 2581–83, are properly limited to that context. But even if, as Defendants assert, the "waiver" principles enunciated in *Blatchford* can be said to speak to Congress' power to abrogate—and we think they do not—the lack of State–Indian mutuality is a matter of relatively minor importance. First, Congress' plenary power over the uniquely federal area of Indian affairs is the primary basis on which we rest today's decision. Second, we are not persuaded that a lack of mutuality between the States and the Indian nations is a compelling deficiency, since there did in fact exist a mutuality between the federal government—in which plenary power to regulate Indian affairs was vested—and the States. And although the lack of State–

Indian mutuality may undercut the argument that the States *waived* their immunity to any and all suits by Indian tribes, the importance of that want of mutuality is diminished when a suit is brought pursuant to explicit congressional authorization, since the linchpin of abrogation must be the nature of the power pursuant to which Congress raised the Eleventh Amendment barrier. Furthermore, to the extent that *Blatchford* does expressly discuss abrogation, that discussion never reaches the issue of congressional power, since the Court concluded that Section 1362 of Title 28 did not contain "unmistakably clear" language evincing Congress' intent to abrogate.[11] —— U.S. at ——, 111 S.Ct. at 2586. Thus, *Blatchford* is wholly silent on the principal issue raised here of congressional power to abrogate, and as such is readily distinguishable. Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss is DENIED.

DONE AND ORDERED.

---

state Commerce Clause, it is the equal distribution of tax burdens among taxpayers, regardless of the absolute amount of the overall burden, that matters."); Resnick, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts,* 56 U.Chi.L.Rev. 671 (1989) ("[T]he 'Indian commerce clause could be read as expansively as the Interstate commerce clause.' Under such a reading, the constitutional limits on congressional power over Indian tribes may be more formal than real." (quoting Clinton, *Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self Government,* 33 Stan.L.Rev. 979, 997 (1981))).

9. At all events, *Cotton Petroleum* is of limited help here since the issue there was whether Indian tribes could be treated as States for tax apportionment purposes.

10. The *Spokane Tribe* and *Sault Ste. Marie* courts also relied on *Blatchford* in reaching the same conclusion.

11. That section provides:

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1362. Notably absent from Section 1362 is language specifically referencing the States, as is present in the statute conferring jurisdiction in the instant case, 25 U.S.C. § 2710(d)(7)(A)(i).